UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLAZ LLC, POSEN INVESTMENTS LP,
and KENOSHA INVESTMENTS LP,

                Petitioners,

    -against-

SYSCO CORPORATION,

                Respondent.

Case No. 1:23-cv-02489-PGG

**RESPONDENT'S OPPOSITION TO
PETITION TO CONFIRM ARBITRATION AWARD**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 2

STATEMENT OF FACTS .............................................................................................. 5

ARGUMENT ................................................................................................................... 5

I.      The COURT Should NOT CONFIRM The PI Award. ......................................... 5

II.     The Tribunal Majority Exceeded Its Powers In Granting the PI
Award ..................................................................................................................... 6

III.    The PI Award Violates Public Policy. .................................................................. 7

     A.     The PI Award Violates The Strong Public Policy Favoring
Settlement. ................................................................................................. 8

     B.     The PI Award Violates The Public Policy Against Allowing
Non-Parties To Control Settlement Decisions. ......................................... 9

     C.     The PI Award Violates The Longstanding Prohibitions On
Champerty In New York And Illinois And Is Unconscionable
In Minnesota. ........................................................................................... 14

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001) .......................................................................... 8

*Canfield v. SS&C Tech. Holdings, Inc.*,
    2021 WL 1022698 (S.D.N.Y. Mar. 17, 2021) ............................................... 6

*Consol. Edison of New York, Inc. v. Util. Workers' Union of Am.*,
    1996 WL 374143 (S.D.N.Y. July 3, 1996) .................................................... 5

*DeMartini v. Johns*,
    693 F. App'x 534 (9th Cir. 2017) .................................................................. 7

*Dietz v. Bouldin*,
    579 U.S. 40 (2016) ........................................................................................ 6

*Fahnestock & Co. v. Waltman*,
    935 F.2d 512 (2d Cir. 1991) .......................................................................... 5

*Family-Friendly Media, Inc. v. Recorder Television Network*,
    74 A.D.3d 738 (2d Dep't 2010) ..................................................................... 4

*Gupta v. Headstrong, Inc.*,
    2018 WL 1634870 (S.D.N.Y. Mar. 30, 2018) ............................................... 8

*Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E.*,
    817 F.3d 857 (3d Cir. 2016).......................................................................... 7

*Howell v. Motorola, Inc.*,
    633 F.3d 552 (7th Cir. 2011) ........................................................................ 8

*Huber v. Johnson*,
    70 N.W. 806 (Minn. 1897).......................................................................... 14

*Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*,
    876 F.3d 900 (7th Cir. 2017) ........................................................................ 7

**Page(s)**

*In re Nat'l Prescription Opiate Litig.*,
    2018 WL 2127807 (N.D. Ohio May 7, 2018).................................................................. 4, 13

*In re Primus*,
    436 U.S. 412 (1978)................................................................................... 15

*In re Sony Corp. SXRD*,
    448 F. App'x 85 (2d Cir. 2011) ........................................................................ 8

*In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*,
    405 F. Supp. 3d 612 (D.N.J. 2019) .................................................................. 13

*Justinian Cap. SPC v. WestLB AG*,
    65 N.E.3d 1253 (N.Y. 2016)............................................................................ 16

*Katz v. Feinberg*,
    290 F.3d 95 (2d Cir. 2002).............................................................................. 5

*Kelly v. K12 Inc.*,
    854 F. App'x 963 (10th Cir. 2021) .................................................................... 7

*Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V.*,
    28 F. Supp. 2d 126 (S.D.N.Y. 1998)................................................................. 14

*Maslowski v. Prospect Funding Partners LLC*,
    944 N.W.2d 235 (Minn. 2020)............................................................. 4, 14, 18-19

*Maslowski v. Prospect Funding Partners LLC*,
    978 N.W.2d 447 (Minn. Ct. App. 2022)............................................................... 9

*Matter of Arbitration Between Melun Indus., Inc. and Strange*,
    898 F. Supp. 990 (S.D.N.Y. 1990) ..................................................................... 5

*Miksis v. Evanston Twp. High Sch. Dist. #202*,
    235 F. Supp. 3d 960 (N.D. Ill. 2017).................................................................. 8

*Miller UK Ltd. v. Caterpillar Inc.*,
    17 F. Supp. 3d 711 (N.D. Ill. 2014) .............................................................. 17-18

*Nw. Nat'l Ins. Co. v. Insco, Ltd.*,
    2011 WL 4552997 (S.D.N.Y. Oct. 3, 2011)........................................................... 6

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ......................................................................... 8

**Page(s)**

*Pro's Choice Beauty Care, Inc.*,
    2017 WL 933089 (E.D.N.Y. Mar. 7, 2017) ....................................................... 7

*Prospect Funding Holdings, LLC v. Saulter*,
    102 N.E.3d 741 (Ill. App. Ct. 2018) ............................................................ 15

*Puckett v. Empire Stove Co.*,
    183 Ill.App.3d 181 (Ill. App. Ct. 1989) ...................................................... 17

*Rodriguez v. Weprin*,
    116 F.3d 62 (2d Cir. 1997)........................................................................... 6

*Schwartz v. Merrill Lynch & Co., Inc.*,
    665 F.3d 444 (2d Cir. 2011)............................................................. 5, 7, 19

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
    484 U.S. 29 (1987)........................................................................................ 5

*V5 Techs. v. Switch, Ltd.*,
    334 F.R.D. 306 (D. Nev. 2019)............................................................... 13-14

*Veninga v. Fmali Herb Co. Inc.*,
    1997 WL 598143 (N.D. Ill. Sept. 17, 1997) ............................................. 10

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
    126 F.3d 15 (2d Cir. 1997)............................................................................ 5

*Zeiler v. Deitsch*,
    500 F.3d 157 (2d Cir. 2007) ......................................................................... 5

**Rules and Statutes**

9 U.S.C. § 10(a)(4).............................................................................................. 5, 7

Fed. R. Civ. P. 1 ................................................................................................. 8-9

Ill. R. Prof'l Conduct R 1.2(a) (eff. Jan. 1, 2010) ............................................... 10

Minn. R. Prof'l Conduct R. 1.2(a) (eff. Oct. 1, 2005) ......................................... 10

N.Y. Jud. Law § 489(1) (McKinney 2004)...................................................... 4, 16

Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.2(a) ........................ 10

**Page(s)**

**Other Authorities**

2 Robert L. Haig, *Commercial Litigation in New York State Courts* § 6:54 (5th ed. 2020) ........................................................................................................   94

Charles Alan Wright & Arthur R. Miller, *Federal Prac. & Proced.* § 1029 (4th ed. 2022) ........................................................................................................   8-9

7 Ill. L. and Prac. *Champerty and Maintenance* § 2 ...........................................   17

7 Ill. L. and Prac. *Champerty and Maintenance* § 5 ...........................................   17

*American Bar Association Best Practices for Third-Party Litigation Funding* (August 2020) .......................................................................................   13, 17

Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Updat*e, Cardozo Law Jacob Burns Inst. For Advanced Legal Studies, Faculty Research Paper No. 671 (2022) .........................................................................   4, 11

Burford Capital Form 20-F 2020, https://www.sec.gov/Archives/edgar/data/1714174/000155837021003401/0001558370-21-003401 index.html ...........................................................................   12

*Champerty*, Black's Law Dictionary (11th ed. 2019) ...........................................   15

England & Wales, *Code of Conduct for Litigation Funders*, Art. 7(b)-(c) (2011), https://www.judiciary.uk/wp-content/uploads/JCO/Documents/CJC/Publications/CJC+papers/Code+of+Conduct+for+Litigation+Funders+(November+2011).pdf .......................................   11

Lesley Stahl, "Litigation Funding: A Multibillion-Dollar Industry for Investments in Lawsuits With Little Oversight," *60 Minutes* (Dec. 18, 2022), https://www.cbsnews.com/news/litigation-funding-60- minutes-2022-12-18/ .................   11-12

Panel 6: The Evolution of Third-Party Litigation Funding, *Sixteenth Annual Judicial Symposium on Civil Justice Issues*, (Oct. 10, 2022), https://masonlec.org/events/sixteenth-annual-judicial-symposium-on-civil-justice-issues/   12

*Report on the Ethical Implications of Third-Party Litigation Funding*, N.Y. State Bar Ass'n (Apr. 16, 2013)  ...........................................................................   17

Respondent Sysco Corporation ("Sysco" or "Respondent") respectfully submits this opposition to the Petition to Confirm Arbitration Award (the "Petition") submitted by Glaz LLC, Posen Investments LP, and Kenosha Investments LP, affiliates of Burford Capital Limited (collectively "Burford" or "Petitioners"). Burford seeks to confirm an arbitral award (the "PI Award") that was entered on March 10, 2023 in an arbitration captioned *Glaz LLC, et al. v. Sysco Corp.* (LCIA No. 225609) (the "Arbitration"), proceeding under the 2014 Rules of Arbitration of the London Court of International Arbitration ("LCIA"), and seated in New York, NY.[1]  The PI Award enjoins Sysco from settling certain antitrust claims pending before federal courts in Illinois and Minnesota.  This Court should decline to confirm the PI Award pursuant to the Federal Arbitration Act ("FAA") because, in issuing it, the divided arbitral tribunal (the "Tribunal") exceeded its powers and violated well-established public policy.

Sysco submits this opposition subject to and without waiving its request that this Action be transferred to the U.S. District Court for the Northern District of Illinois for the reasons set forth in Sysco's pre-motion conference request.  *See* ECF No. 5.  As further explained in that request, the Northern District of Illinois is the appropriate forum for this action under the first-to-file rule

---

[1] Capitalized terms not defined here have the same meanings as in Sysco's March 20, 2023 Amended Petition to Vacate Arbitration Award, filed in the U.S. Court for the Northern District of Illinois ("Amended Petition").  *See* ECF No. 5-1 (Amended Petition).   Reference is also made to the Declaration of Patrick C. Swiber ("Swiber Decl."), which is filed together with this opposition and lists exhibits referenced in it.  Certain exhibits to the Swiber Declaration remain partially under seal in the Northern District of Illinois, subject to Burford's pending Motion for Protective Order in that court.  Sysco is submitting those documents with the redactions Burford has proposed (but that the Illinois court has not yet approved) and has provided notice to Burford that Burford may seek continued sealing consistent with Rule II.B of this Court's Individual Rules of Practice.

because Sysco's March 8, 2023 petition to vacate a precursor to the PI Award was filed there before Burford filed this action. *See id.* at 3-4.[2]

## PRELIMINARY STATEMENT

Sysco, a large U.S. distributor of food and related products, is one of a number of plaintiffs litigating antitrust claims in the Northern District of Illinois and the District of Minnesota against suppliers of chicken, pork, beef, and other food products ("Antitrust Litigations"). Burford, a litigation funder, made a passive investment in Sysco's antitrust claims in exchange for a share of any proceeds. Burford's only interest in Sysco's claims is a potential financial return. The funding agreement between Burford and Sysco (the "CPA"), as amended by a March 2022 Amendment No. 1 (the "Amendment"), provides Burford with a limited settlement consent right (such consent not to be unreasonably withheld, among other limitations), such that Burford may claim damages were Sysco to settle in violation of its contractual obligations; the CPA does not and could not give Burford a veto right over Sysco's settlement of its own claims. *See* Swiber Decl. Ex. A, CPA; Swiber Decl. Ex. B, CPA March 2022 Amendment.

In August 2022, after years of litigation, and after lengthy settlement negotiations and mediation, Sysco succeeded in securing reasonable (indeed, favorable) settlement offers from certain antitrust defendants (the "Proposed Settlements"). Sysco presented the material terms of the Proposed Settlements to Burford, and explained why it believed further negotiation or litigation would not result in a higher recovery. Burford advised Sysco that it considered the offers to be

---

[2] While Sysco has moved to vacate the petition in the Northern District of Illinois, it reserves the right to do so in this Court in the event Burford obtains the dismissal of that petition other than on the merits, this Court declines to transfer this action to the Northern District of Illinois and/or there is no resolution of those pending motions prior to Sysco's three-month statutory deadline to move to vacate.

too low in comparison to other settlements in the Antitrust Litigations of which it was aware and, to Sysco's surprise, asserted it could block settlement and force Sysco to litigate against its will.

On September 9, 2022, Burford initiated the Arbitration against Sysco seeking, *inter alia*, to enjoin Sysco from executing the Proposed Settlements.  In September and October 2022, Burford submitted (and then abandoned) two applications for immediate injunctive relief.  Then, more than three months after it initiated the Arbitration, Burford filed a Third Application requesting a preliminary injunction restraining Sysco from executing the Proposed Settlements and an immediate, *ex parte* temporary restraining order ("TRO").  Just two days later, on December 14, 2022, the Tribunal granted Burford's request and issued a TRO, which had no end date and remained in effect for nearly three months.[3]  Two months later, on February 6-7, 2023, the Tribunal conducted a hearing on Burford's request for a preliminary injunction.[4]  On March 10, the Tribunal issued the PI Award, in which a 2-1 majority enjoined Sysco from executing settlements in the federal Antitrust Litigations.  *See* ECF No. 1-3 (PI Award).

The PI Award is deeply flawed:  it fails to identify a single supporting precedent on several material issues, and ignores substantial evidence and uncontroverted legal authority irreconcilable with its holding.[5]  However, because even egregious arbitration awards that manifestly disregard

---

[3] In doing so without even granting Sysco an opportunity to submit a substantive response, the Tribunal exceeded its powers because such relief is prohibited by the LCIA Rules (which govern the Arbitration) and by New York law (which governs the parties' agreement), and violated deep-rooted public policy (including prohibitions on champerty).

[4] A month later, the Tribunal had not yet ruled, and declined to commit to issuing a ruling in advance of Sysco's statutory March 14 deadline to seek to vacate the TRO; consequently, to ensure sufficient time for service, on March 8 Sysco filed a petition challenging the TRO in the U.S. District Court for the Northern District of Illinois.  *See* Swiber Decl. Ex. C, Sysco's March 8, 2023 Petition to Vacate Arbitration Award.

[5] For example, the Tribunal's decision rested largely on an alleged "ripple effect" that Burford asserted the Proposed Settlements might have on Burford's financial interest in other claims.  As Co-Arbitrator John J. Kerr noted in his dissent to the PI Award, that is not a valid reason to impose

the law and evidence, as here, are subject only to narrow judicial review, Sysco focuses this memorandum in opposition on the clearly cognizable grounds prohibiting confirmation of this award under the FAA: the PI Award violates public policy by forcing Sysco to reject reasonable settlements and litigate against its will, saddling two federal courts with management of claims that the litigants want to resolve. Indeed, "'it is difficult to conceive of any stipulation more against public policy' than a contract term requiring the litigation financier's permission to settle the underlying litigation." *Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 241 (Minn. 2020) (quoting *Huber v. Johnson*, 70 N.W. 806, 808 (Minn. 1897)).[6] Burford's own Ethics Consultant has written that a "funding agreement that allows a funder to take control of settlement" would be "seen as against public policy in every state."[7] We are aware of no case upholding such an agreement; on the contrary, it is self-evident to courts confronting this issue that they are unenforceable. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807, at *1 (N.D. Ohio May 7, 2018) (funding agreements that "give to the lender any control over litigation strategy or settlement decisions" will be "deem[ed] unenforceable").

---

a preliminary injunction under New York law (and we are not away of any court having done so). *See* ECF No. 1-3 at 123-124 ¶¶ 2-5 ("PI Dissent"). First, any harm suffered by Burford (a financial investor) is indisputably purely economic. "[E]conomic loss, which is compensable by money damages, does not constitute irreparable harm." *Family-Friendly Media, Inc. v. Recorder Television Network*, 74 A.D.3d 738, 739-40 (2d Dep't 2010). Second, the alleged harm from this "ripple effect" is too speculative to support a preliminary injunction. *See* PI Dissent ¶ 4.

[6] *See also* N.Y. Jud. Law § 489(1) (prohibiting individuals and companies from purchasing or taking an assignment of notes, other securities, "or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon").

[7] Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Update*, Cardozo Law Jacob Burns Inst. For Advanced Legal Studies, Faculty Research Paper No. 671 (2022).

## STATEMENT OF FACTS

Rather than burden the Court with redundant filings, Sysco incorporates by reference all facts in its Amended Petition, *see* ECF No. 5-1, as if set forth herein.

## ARGUMENT

## I.    THE COURT SHOULD NOT CONFIRM THE PI AWARD.

Because the PI Award is a New York Convention award, made under Chapter 2 of the FAA, and issued in an arbitration seated in the United States, *see* ECF No. 5-1 ¶ 8, the grounds for vacatur (and therefore for denying confirmation) are set forth in Chapter 1 of the FAA, specifically, 9 U.S.C. § 10.  *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22-23 (2d Cir. 1997) ("The [New York] Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."); *Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007) (New York Convention award is "subject to the FAA provisions governing domestic arbitration awards" if "the arbitration took place in the United States").  Two such grounds are found here, and each is independently sufficient to deny confirmation:

- The arbitrators "exceeded their powers," *see* 9 U.S.C. § 10(a)(4), by "reaching [an] issue" that "law . . . categorically prohibits the arbitrator from reaching."  *See Fahnestock & Co. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991); *Katz v. Feinberg*, 290 F.3d 95, 97-98 (2d Cir. 2002)); *Matter of Arbitration Between Melun Indus., Inc. and Strange*, 898 F. Supp. 990, 992-93 (S.D.N.Y. 1990); and

- "[T]he contract as interpreted by [the arbitrators] violates some explicit public policy." *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 451-52 (2d Cir. 2011); *Consol. Edison of New York, Inc. v. Util. Workers' Union of Am.*, 1996 WL 374143, at *5 (S.D.N.Y. July 3, 1996) ("Based on the undisputed facts, the enforcement of the Arbitrator's award . . . is contrary to the explicit, well-defined, and dominant public policy against sexual harassment in the workplace."); *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42-43 (1987) (vacatur is warranted if the award violates "well defined and dominant" public policy (citation omitted)).

## II.    THE TRIBUNAL MAJORITY EXCEEDED ITS POWERS IN GRANTING THE PI AWARD.

Federal courts have not permitted arbitrators to interfere in management of judicial proceedings.  For example, courts have repeatedly rejected efforts by arbitrators to impose attorney discipline or to disqualify attorneys in proceedings before them, holding that only courts may decide such core issues related to their functioning.  *See, e.g.*, *Nw. Nat'l Ins. Co. v. Insco, Ltd.*, 2011 WL 4552997, at *5 (S.D.N.Y. Oct. 3, 2011) (despite the "liberal federal policy favoring arbitration," the court "continues to play a central role in issues involving attorney disqualification"); *Canfield v. SS&C Tech. Holdings, Inc.*, 2021 WL 1022698, at *2 (S.D.N.Y. Mar. 17, 2021) ("Attorney disqualification is better decided by courts rather than arbitrators.").

The same principle applies here, as the PI Award infringes on the federal courts' discretion and oversight over federal litigation.  Arbitrators have no power to bar a plaintiff from settling a federal action, to force a plaintiff to litigate federal claims against its will, or to burden the taxpayer-funded federal courts with management of unnecessary litigation.  *See, e.g.*, *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."); *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir. 1997) ("A court's inherent power to control its docket is part of its function of resolving disputes between parties.").  In his dissent, arbitrator John J. Kerr expressly highlighted this issue, noting that the majority was "unwisely involv[ing] [itself] in the federal court proceedings, a result that can and should be avoided if possible."  *See* ECF No. 1-3 at pgs. 125-126.  The Tribunal majority overstepped its authority by issuing a PI Award that burdens federal courts in Illinois and Minnesota with unnecessary litigation, risks congesting the courts' dockets, and harms the public's interest in the efficient functioning of the courts.  As Mr. Kerr noted, the resulting "waste of resources" is "palpable."  *Id.*  That is grounds for vacatur.

## III.   THE PI AWARD VIOLATES PUBLIC POLICY.

The Court should independently deny confirmation of the PI Award because it violates public policy.  *See* 9 U.S.C. § 10(a)(4).  If an arbitrator's interpretation of a contract violates public policy, courts "are obliged to refrain from enforcing it."  *Schwartz* , 665 F.3d at 452  (quoting *W.R. Grace and Co v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983)).[8]  While the public policy should be "well-defined and dominant as 'ascertained by reference to the laws and legal precedents[,]'" ultimately "[t]he determination of the relevant public policy is for the court."  *Pro's Choice Beauty Care, Inc.,* 2017 WL 933089, at *3 (E.D.N.Y. Mar. 7, 2017) (vacating a portion of an arbitral award for violating public policy) (quoting *W.R. Grace & Co.*, 461 U.S. at 766).[9]

By allowing Burford to control the settlement of Sysco's claims, the PI Award violates well-established public policy in all potentially relevant jurisdictions:  New York, the state whose law governs the CPA, as well as Illinois and Minnesota, the states in which the underlying Antitrust Litigations are pending.  The Tribunal majority did not so much as mention Illinois or Minnesota law or policy, and simply accepted Burford's expert opinions on New York law in a conclusory manner with scant analysis.  *See* ECF No. 1-3 at 110-113 ¶¶ 202-08.

---

[8] Other courts also consider public policy challenges to arbitral awards.  *See, e.g.*, *Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857, 861-62 (3d Cir. 2016); *Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 903 (7th Cir. 2017); *DeMartini v. Johns*, 693 F. App'x 534, 537 (9th Cir. 2017); *Kelly v. K12 Inc.*, 854 F. App'x 963, 964-65 (10th Cir. 2021).

[9] Sysco, after a reasonably diligent search, is not aware of any precedent or authority requiring this Court to limit its review to the public policy of any particular jurisdiction.  Accordingly, and in light of the Second Circuit's clear disfavor for arbitral awards that offend well-defined and dominant public policies, the Court need not do so here.

### A.   The PI Award Violates The Strong Public Policy Favoring Settlement.

There is a uniform, nationwide public policy in favor of settlement.  *See, e.g.*, *Gupta v. Headstrong, Inc.*, 2018 WL 1634870, at *3 (S.D.N.Y. Mar. 30, 2018) ("Federal courts … have 'articulated a strong policy in favor of enforcing settlement agreements and releases.'") (quoting *Levine v. Board of Educ. of City of N.Y.*, 1998 WL 386141, at *2 (2d Cir. May 21, 1998)); *In re Sony Corp. SXRD*, 448 F. App'x 85, 87 (2d Cir. 2011) ("Public policy favors settlement."); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("[I]t is axiomatic that the law encourages settlement of disputes.").  Like the Second Circuit, the Seventh and Eighth Circuits—where Sysco has been forced to continue litigating against its will—embrace a "strong policy" in favor of settlement.  *See, e.g.*, *Howell v. Motorola, Inc.*, 633 F.3d 552, 561 (7th Cir. 2011) (recognizing the "importance of the federal policy in favor of voluntary settlement of claims"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("[A] strong public policy favors agreements.") (internal quotation omitted).  *See also Miksis v. Evanston Twp. High Sch. Dist. #202*, 235 F. Supp. 3d 960, 987 (N.D. Ill. 2017) (acknowledging the strong federal policy favoring voluntary resolution of disputes).

This public policy safeguards the material benefits of settlement, which allows parties to resolve their disputes by amicable compromise, avoid the burden, risk, and uncertainty of trial, and obtain immediate clarity and finality; settlement also eases the strain on overburdened courts, a benefit to the courts themselves, other litigants, and taxpayers.  *Miksis,* 235 F. Supp. 3d at 987.[10] Reflecting this policy, the Federal Rules of Civil Procedure emphasize that their purpose is "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R.

---

[10] As the Court is undoubtedly aware, the federal courts are over-burdened with high caseloads. *See, e.g.*, 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1029 (noting that "district courts today fac[e] historically high caseloads").

Civ. P. 1; *see also* 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1029 (4th ed. 2022) ("There probably is no provision in the federal rules that is more important than this mandate").[11]

As long as the PI Award remains in place, Sysco and the defendants with whom it has negotiated reasonable settlements in good faith are trapped in protracted and unnecessary litigation (which also burdens federal courts in Illinois and Minnesota and the taxpayers who fund them) and face the burden, risk, and uncertainty of the prospect of trial. Similarly, the PI Award has obstructed Sysco from negotiating settlements with other defendants. Moreover, the Proposed Settlements may be withdrawn at any time (particularly as decisions in the Antitrust Litigations inevitably affect the fragile settlement dynamic) and, as the cases proceed, including through adjudication of dispositive and pre-trial motions, settlement may become more difficult to achieve down the road.[12] This result is exactly what the public policy favoring settlements seeks to prevent.

**B.** **The PI Award Violates The Public Policy Against Allowing Non-Parties To Control Settlement Decisions.**

A party's freedom to settle claims is sacrosanct. *See, e.g.*, *Maslowski v. Prospect Funding Partners LLC*, 978 N.W.2d 447, 457 (Minn. Ct. App. 2022) (invalidating litigation funding arrangement that interfered with party's "control over her underlying lawsuit" because it

---

[11] Rule 1 also makes clear that "[t]he primary purpose of procedural rules is to promote the ends of justice." *See* Wright & Miller, *supra* § 1029. In other words, it is fundamental that the federal courts exist to promote justice, not the financial returns of a litigation funder that seeks to prolong a litigation that the parties wish to settle in the hopes that it will yield a higher return for the funder. Here, the Tribunal majority is forcing Sysco to litigate its claims so that Burford can hope to receive a higher return not just on Sysco's claims, but on other investments that have nothing to do with Sysco.

[12] *See, e.g.*, Ongoing process from commencement of the case—How are the issues being framed?, 2 Robert L. Haig, *Commercial Litigation in New York State Courts* § 6:54 (5th ed. 2020) (ongoing developments of a case, such as factual discovery, as well as developments in applicable law, can affect settlement analysis).

"[r]estricted [her] freedom to enter into settlements"); *see also* Swiber Decl. Ex. D, Expert Report of Professor Maya Steinitz in Support of Sysco Corporation's Petition to Vacate Arbitration Award ¶¶ 53-59 (N.D. Ill. Mar. 8, 2023) ("First Steinitz Report"); Swiber Decl. Ex. E, Supplemental Expert Report of Professor Maya Steinitz in Support of Sysco Corporation's Amended Petition to Vacate Arbitration Award (N.D. Ill. Mar. 20, 2023).   The public policy that parties cannot be deprived of control over their own settlement decisions is also reflected in a number of legal rules and doctrines.   Most prominently, the Rules of Professional Conduct, which govern the relationship between clients and lawyers, embody that principle.   *See* Swiber Decl. Ex. D, First Steinitz Report ¶¶ 60-65.  New York (whose law governs the CPA), Illinois, and Minnesota require professionals to "abide by a client's decisions concerning the objectives of representation," including "a client's decision whether to settle a matter."   *See* Rules of Professional Conduct [22 NYCRR 1200.0] Rule 1.2(a); Ill. R. Prof'l Conduct R 1.2(a) (eff. Jan. 1, 2010), Minn. R. Prof'l Conduct R. 1.2(a) (eff. Oct. 1, 2005).  Illinois courts have voided as against public policy contracts that prevent clients from settling their own suits.  *Veninga v. Fmali Herb Co. Inc.*, 1997 WL 598143, at *3 (N.D. Ill. Sept. 17, 1997) ("[I]f a lawyer attempts to draw a contract where the clients are prevented from settling their own suit, the contract is void as against public policy.") (citing Rule 1.2(a)).

Even if Burford is not directly bound by the Rules of Professional Conduct, the public policy animating these rules precludes Burford from blocking Sysco from settling its claims.[13] This is widely understood, including by Burford itself—Burford's own ethics consultant wrote last year that "any funding agreement that allows a funder to take control of settlement" would be "seen as against public policy in every state."  Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Updat*e, Cardozo Law Jacob Burns Inst. For Advanced Legal Studies, Faculty Research Paper No. 671, 11 n.41 (2022)).[14]

Cognizant of the widespread concern from the public and regulators that litigation funding agreements might strip litigants of control over their own claims (and that litigants—Burford's potential clients—might worry about that loss when considering an offer of funding), Burford, together with other litigation funders, has repeatedly made public statements (to actual and potential clients including Sysco, investors, regulators, Congress and the public at large) unequivocally affirming that "litigation funders do not control litigation strategy."  Swiber Decl. Ex. F, Oct. 3, 2022 ILFA Letter to Judicial Conference of the United States at 4 (also stating that "[a] finance provider's ability to control litigation is further limited by . . . the doctrines of

---

[13] The leading U.S. professional association of litigation funders has acknowledged to Congress that a funder's role *is* "[] limited by the Rules of Professional Conduct."  *See* Swiber Decl. Ex. F, 2022 ILFA Letter to Judicial Conference of the United States at 4.  In addition, the Association of Litigation Funders of England and Wales, of which Burford is a member, has set out standards of practice and behavior for its members in the Code of Conduct for Litigation Funders.  According to that Code, which nowhere contemplates that a funder may control settlement, a funder will "not seek to influence the Litigant's solicitor or barrister to cede control or conduct of the dispute to the Funder."  The Ass'n of Litig. Funders of England & Wales, *Code of Conduct for Litigation Funders*,        Art.        7(b)-(c)        (2011), https://www.judiciary.uk/wp-content/uploads/JCO/Documents/CJC/Publications/CJC+papers/Code+of+Conduct+for+Litigation+Funders+(November+2011).pdf.

[14] The Tribunal majority completely ignored this evidence.

champerty and maintenance.").[15]   And the CPA itself further illustrates Burford's clear understanding that public policy bars it from controlling how its clients resolve their claims by affirming this principle in multiple places.[16]

This public policy is animated by concerns about the integrity of the US court system as a whole—it is intended to be a forum where disputes may be resolved and justice may be done, not a casino in which financial speculators may gamble with claims that are not their own or prolong

---

[15] *See also* Lesley Stahl, "Litigation Funding: A Multibillion-Dollar Industry for Investments in Lawsuits With Little Oversight," *60 Minutes* (Dec. 18, 2022), https://www.cbsnews.com/news/litigation-funding-60- minutes-2022-12-18/ (Stahl: "What if the client that you've given all this money to, invested in, wants to settle, and you think that's a mistake?" Burford's CEO: "Clients are free to run their litigations as they see fit… It's not uncommon for them to come and ask for our advice but it's advice. And the client is free to disregard that advice and take its own path."); Burford Capital Form 20-F 2020 at 11, https://www.sec.gov/Archives/edgar/data/1714174/000155837021003401/0001558370-21- 003401 index.html, ("… in our legal finance business [] we are financing a client who retains decision-making authority in the litigation."); Panel 6: The Evolution of Third-Party Litigation Funding, Sixteenth Annual Judicial Symposium on Civil Justice Issues, Oct. 10, 2022, available at https://masonlec.org/events/sixteenth-annual-judicialsymposium-on-civil-justice-issues/. (Comments of Burford representative: "And again, I don't know how to say this any more clearly, we don't control settlement. If we do, I know that Burford Capital as a funder is not subject to ethical rules because we're not a lawyer, but I am a lawyer, and I do take ethical rules seriously, and I would find it really loathsome to misrepresent that to a court.").

[16] *See* Swiber Decl. Ex. A, CPA at 2 (emphasis added) ("[T]he Capital Providers are each passive providers of external capital and have not become owners of, partners in, or parties to the claims or any part thereof or acquired any rights as to their control or resolution . . . . *the Counterparty remains in full control of the assertion and resolution of the claims*"); § 5.2(b) ("[E]ach Capital Provider agrees with the Counterparty that . . . such Capital Provider shall not be entitled to control or direct the conduct of the Claims, or to require settlement thereof"); § 5.2(c) ("[E]ach Capital Provider agrees with the Counterparty that . . . the Counterparty shall have day-to-day and overall control over the conduct of, and responsibility for, the Claims and neither the Capital Providers nor their respective Affiliates shall exercise, or seek to exercise, any such control over the Claims"); § 5.2(d) ("[E]ach Capital Provider agrees with the Counterparty that . . . such Capital Provider and its respective Affiliates shall do nothing that compromises the professional duties of any of the Nominated Lawyers"); § 5.2(e) ("[E]ach Capital Provider agrees with the Counterparty that . . . such Capital Provider and its respective Affiliates shall act in good faith in all of its dealings with the Counterparty and shall comply diligently with this Agreement.").

litigation for motives that (as here) have nothing to do with the funded litigants' own claims, such as the ability to use one party's claims to extract value relating to another investment entirely. Attempting to distract from the fact that, if the PI Award is upheld as consistent with public policy, Burford and other litigation funders would be able to exert control over settlement in *all* circumstances because there is no limiting principle that would allow Burford to control settlement with respect to some clients but not others, Burford has focused on irrelevant issues, including by attempting to paint Sysco as a bad actor by complaining about an earlier dispute between the parties about certain assignments and painting its Sysco contract as unique.[17]  The simple reality is that Burford is not standing in the way of the Proposed Settlements to punish Sysco for some purported earlier bad conduct, but rather because Burford hopes to make more money on Sysco's claims and Burford's unrelated investments by forcing Sysco to continue litigating against its will.  And if it can do so here, it can do so in all of its contracts.  Such naked speculation in litigation is precisely what public policy forbids.[18]

　　　　We are aware of no case in which *any* court has permitted a litigation funder to buy control over a party's settlement decision.[19]  On the other hand, obviously troubled by the possibility that a litigation funder might lurk behind the scenes of a multi-district litigation and secretly pull a plaintiff's strings, the Northern District of Ohio recently ordered that it would "deem unenforceable any . . . financing agreements" that "g[a]ve to the lender any control over litigation

---

[17] *See* Swiber Decl. Ex. G, Burford's Request for Arbitration; Amended Petition ¶¶ 25-26.

[18] *See* Swiber Decl. Ex. D, First Steinitz Report ¶¶ 19-24.

[19] Indeed, such control would be antithetical to ABA guidance on litigation funding.  ABA House of Delegates' Resolution 111A provides that "funding agreement[s] should be drafted to assure that (a) the client retains control of the litigation (including, for example, decisions as to whether to settle or discontinue the litigation as opposed to proceeding to trial or verdict), and (b) that the lawyer retains independent professional judgment." ABA Res. 111A (2020) at 12-13.

strategy or settlement decisions." *In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807, at *1 (N.D. Ohio May 7, 2018).  Ironically, Burford celebrated this order as a "model for other judges to follow" (presumably not anticipating in 2018 what it would attempt in 2022).  Swiber Decl. Ex. H, May 2018 Burford Press Release at 2; *see also* Swiber Decl. Ex. I, Feb. 20, 2019 Funders' Letter at 2 (praising the order as presenting a "sensible approach").[20]  In issuing the PI Award enjoining Sysco from settling its claims without Burford's consent (before concluding definitively that Burford had even satisfied the contractual limitations on its consent right, for example, the requirement that it not withhold its consent unreasonably), the Tribunal majority trampled a public policy so deep-rooted and widespread that Burford itself has vocally affirmed it.  Burford's petition to confirm the PI Award must therefore be denied as contrary to public policy.

### C.  The PI Award Violates The Longstanding Prohibitions On Champerty In New York And Illinois And Is Unconscionable In Minnesota.

By blocking the proposed settlement agreements and compelling Sysco to litigate, the PI Award gives effect to an interpretation of the CPA that violates the longstanding prohibitions on champerty in New York and Illinois.  For this reason, the contract as construed in the PI Award is illegal, and thus, unenforceable.  *See, e.g.*, *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V.*, 28 F. Supp. 2d 126, 138 (S.D.N.Y. 1998) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object[.]") (quoting *McConnell v. Commonwealth Pictures Corp.*, 7

---

[20] *See also In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*, 405 F. Supp. 3d 612, 618-19 (D.N.J. 2019) (accepting *in camera* review of litigation funding documents "where the litigation funding company has control or input into litigation decisions, including settlement, which could interfere with a plaintiff's control of his or her lawsuit and the attorney-client relationship") (internal quotations omitted); *V5 Techs. v. Switch, Ltd.*, 334 F.R.D. 306, 312 (D. Nev. 2019) (stating that discovery into funding arrangements "will be [o]rdered where there is a sufficient showing that a non-party is making ultimate litigation or settlement decisions . . .").

N.Y.2d 465, 469 (1960)).  The PI Award is also unconscionable in Minnesota, where the *Pork* and *Beef* litigations are proceeding, and where the case law is clear that a litigation funder cannot wrest control of claims from the litigant.[21]  Although the PI Award violates the prohibition on champerty in Illinois and is unconscionable in Minnesota, the Tribunal majority made no effort to address the public policies of those jurisdictions.  *See* ECF No. 5-1 ¶¶ 66-67.

Champerty is "helping another prosecute a suit . . . in return for a financial interest in the outcome."  *In re Primus*, 436 U.S. 412, 424 n.15 (1978).  As a general matter, the prohibition on champerty bars certain types of "agreement[s] to divide litigation proceeds between the owner of [a] litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim."  *Champerty*, Black's Law Dictionary (11th ed. 2019).  As Professor Steinitz explains, the prohibition on champerty is longstanding—it dates back to Greek and Roman times—and the harms it seeks to avoid remain a serious concern today, especially given the recent (and largely unregulated) proliferation of litigation funding:  using the courts for a purpose other than the pursuit of justice, overburdening the courts with needless or prolonged litigation, and limiting litigants' control over their own cases.  Swiber Decl. Ex. D, First Steinitz Report ¶¶ 19-24; *see also Prospect Funding Holdings, LLC v. Saulter*, 102 N.E.3d 741, 748 (Ill. App. Ct. 2018) (citation and quotation marks omitted) (describing the "ill effects" of giving strangers a contingent interest in the outcome of litigation, including "encouraging people to sue," "creating a disincentive to settle[,] and permitting strangers to profit from the litigation of others").

In March, emboldened by the PI Award, Burford revealed to Sysco that it seeks to control not merely Sysco's settlements, but the day-to-day prosecution of its claims.  *See* Amended

---

[21] *See, e.g.*, *Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 238 (Minn. 2020); *Huber v. Johnson*, 70 N.W. 806, 808 (Minn. 1897).

Petition, ECF No. 5-1 ¶¶ 69-73; Swiber Decl. Ex. J, D. Ho Letter (Mar. 17, 2023).  In blatant retaliation for Sysco's pursuit of its legal rights in court, Burford threatened to declare Sysco in breach of the CPA (provisions in the original funding agreement that predated any dispute about assignments) and to pursue extreme remedies—including by replacing Sysco's counsel and directing all aspects of the Antitrust Litigations behind the scenes[22]—if Sysco would not withdraw its petition with prejudice.  *See* Amended Petition, ECF No. 5-1 ¶¶ 70-71.  Under threat of seizing control of the Antitrust Litigations entirely, Burford also made a number of extraordinary demands, including dictating what procedural motions Sysco could file in the Antitrust Litigations and Sysco's selection of new outside counsel, a process that is necessary because Sysco was forced to discharge its prior counsel, Boies Schiller Flexner LLP, after Burford induced it to violate its fiduciary duties to Sysco.  *See id.* ¶¶ 30-40.

The PI Award embraces an interpretation of the CPA that would be champertous under New York law.  *See* Swiber Decl. Ex. D, First Steinitz Report ¶¶ 46-51.  New York's prohibition on champerty is codified in New York Judiciary Law section 489(1), which prohibits individuals and companies from purchasing or taking a direct or indirect assignment of "any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon."  *See* N.Y. Jud. Law § 489(1); *see also Justinian Cap. SPC v. WestLB AG*, 65 N.E.3d 1253 (N.Y. 2016).  The statute by its terms looks to three factors, each of which suggests that the PI Award's interpretation of the CPA is champertous under New York law:

> *(i)*     The "type of interest taken": indirect assignments of claims are within the scope of Section 489(1), and the Tribunal's interpretation of the PI Award

---

[22] Burford has claimed a right under Section 13.1 of the original CPA to seize control over Sysco's attorney-client relationship, replace counsel and direct all aspects of the Antitrust Litigations if Sysco merely challenges the enforceability of Burford's claimed right to threaten or take these actions. *See* Swiber Decl. Ex. A, CPA § 13.1.  This provision appears to be part of Burford's standard form agreement.

> effectively assigns Sysco's antitrust claims to Burford by allowing Burford to assert a veto right over Sysco's Proposed Settlements and forcing Sysco to litigate against its will;
>
> (ii)    The "thing in which the interest is taken": Burford's interest is in Sysco's "claims," which squarely falls under Section 489(1); and
>
> (iii)   The "purpose for which the interest is taken": Section 489(1)'s prohibition extends to circumstances where the relevant transaction was undertaken "with the intent and for the purpose of bringing an action or proceeding," and the PI Award's interpretation of the parties' agreements allows Burford to force the litigation of claims that would not otherwise be before the court.

*See* Swiber Decl. Ex. D, First Steinitz Report ¶¶ 48-51.  The American Bar Association and the New York State Bar Association have also cautioned against allowing a third-party funder to control or manage a party's litigation.[23]

As interpreted by the PI Award, the CPA is also champertous under Illinois law.  In Illinois, the prohibition on champerty was established at common law over 100 years ago.  *See* 7 Ill. L. and Prac. *Champerty and Maintenance* § 2 (citing cases).  While "the tendency of the decisions has been to depart from the severity of the old law," which regarded champerty as *malum in se*, or inherently immoral, Illinois courts continue to "preserve the principle which tends to defeat the mischief to which the old law was directed, namely, the traffic of merchandising in quarrels and of huckstering in litigious discord."  *Id.*; *see also* Swiber Decl. Ex. D, First Steinitz Report ¶ 43.

An agreement violates the Illinois prohibition on champerty when there is "an undertaking by one person to defray the expenses, in whole or in part, of another's action," and "an agreement on the part of the latter to divide with the former the proceeds of the litigation."  7 Ill. L. and Prac.

---

[23] *American Bar Association Best Practices for Third-Party Litigation Funding* (August 2020) at 15; *Report on the Ethical Implications of Third-Party Litigation Funding*, N.Y. State Bar Ass'n (Apr. 16, 2013) at 10 (describing the risk for tension between the investor's interest in "instructing, or even mandating, that the party make certain strategic decisions that best serve the investor's goals, and the party's or lawyer for the party's exercise of independent judgment," noting that this risk was "exacerbated where the investor expects to participate in case management decisions").

17

*Champerty and Maintenance* § 5.   Courts applying Illinois law may also consider whether the person defraying the expenses—in this case, the litigation funder—is "promoting the litigation of another which otherwise might not be maintained." *Puckett v. Empire Stove Co.*, 183 Ill.App.3d 181, 191 (Ill. App. Ct. 1989); *see also Miller UK Ltd. v. Caterpillar Inc.*, 17 F. Supp. 3d 711, 724-25 (N.D. Ill. 2014) (quoting *Puckett*, 183 Ill. App.3d at 91-92).[24]   Here, Burford is defraying the expenses of Sysco's antitrust actions in exchange for a portion of any proceeds, thus satisfying the first two factors set out above.   As for the third factor, that is the direct and inescapable effect given to the CPA by the PI Award:   it blocks Sysco from entering into the proposed settlement agreements and compels Sysco to continue litigating in circumstances where it would not otherwise do so.   This is champertous under Illinois law.   Furthermore, Burford's March 17, 2023 effort to force Sysco to initiate new litigation asserting new claims that have not yet otherwise been brought squarely falls within the Illinois definition.   *See* Swiber Decl. Ex. J, D. Ho Letter (Mar. 17, 2023).

The PI Award is also unconscionable and thus unenforceable under Minnesota law, where the *Pork* and *Beef* litigations are proceeding, and where Sysco has claims that the PI Award bars it from settling.   While the Minnesota Supreme Court recently abolished the champerty doctrine, it made clear that the concerns animating that doctrine remain relevant and, importantly, that courts should continue to "scrutinize" litigation funding agreements to determine whether "equity allows their enforcement," or they are unconscionable.   *Maslowski*, 944 N.W.2d at 241.   In this context,

---

[24] *Miller* noted that the prohibitions on champerty and maintenance have been "narrowed" in Illinois, *Miller*, 17 F. Supp. 3d at 727, thereby affirming their continued vitality.   *See also* Swiber Decl. Ex. D, First Steinitz Report ¶ 43.   Moreover, the district court in *Miller* was focused on the "criminal maintenance statute," rather than the common law prohibition on champerty.   *See Miller*, 17 F. Supp. 3d at 727.   *See also id.* at 725 (citation omitted) ("Being a criminal statute, it must be strictly construed.").

the Minnesota Supreme Court specifically directed that litigation funders must not "attempt to control the course of the underlying litigation," and that "'it is difficult to conceive of any stipulation more against public policy' than a contract term requiring the litigation financier's permission to settle the underlying litigation." *Id.* (quoting *Huber*, 70 N.W. at 808) (emphasis added).

In granting the PI Award, the majority failed to meaningfully consider these issues, including any of the applicable standards or case law from Minnesota or Illinois (which were presented by Sysco and Professor Steinitz). But for present purposes, the extent to which the majority failed to fully or properly address these matters is irrelevant: it is ultimately for this Court—not any tribunal—to determine whether the interpretation of the CPA embraced by the PI Award violates public policy. *Schwartz*, 665 F.3d at 452.[25] It unequivocally does so. Confirmation should be denied on this ground alone. *Id.* (where interpretation of a contract violates public policy, courts "are obliged to refrain from enforcing it.").

The PI Award gives effect to an interpretation of the CPA that grants Burford unrestricted control over Sysco's ability to execute desired settlements of its antitrust claims. Such an interpretation violates New York's, Illinois', and Minnesota's public policy in favor of settlements and public policy against allowing non-parties to control settlement decisions. *See supra* III.A-B. Moreover, the PI Award violates deep-seated champerty prohibitions in New York and Illinois and is precisely the type of restraint over a plaintiff's settlement authority that the Minnesota

---

[25] The Tribunal majority recognized that this public policy determination was ultimately for a court, not the Tribunal, to decide: "However, the battle of the experts… at this stage leaves the Tribunal with making the determination that one set of professors has been more persuasive than the other *in predicting what a New York court would do* when faced with the questions whether Burford's asserted consent right violates New York champerty law, or federal and state policy encouraging settlement of lawsuits, or public policy and legal ethics codes concerning a client's right to control litigation." *See* PI Award, ECF No. 1-3 ¶ 203 (emphasis added).

Supreme Court stated emphatically would be clearly unconscionable.  *See supra* III.C.  The petition to confirm the PI Award should thus be denied because the PI Award is champertous and unconscionable.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Court deny Burford's Petition.

Dated: May 3, 2023
      New York, New York

Respectfully submitted,

*/s/ Jeffrey A. Rosenthal*
Jeffrey A. Rosenthal
Lina Bensman
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999
jrosenthal@cgsh.com
lbensman@cgsh.com

Christopher P. Moore
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2 London Wall Place
London EC2Y 5AU
United Kingdom
+ 44 20 7614 2200 (Telephone)
cmoore@cgsh.com